OPINION
{¶ 1} CTI Audio, Inc. ("CTI"), TLH Properties Ltd. ("TLH"), and William and Laura Ross appeal from a judgment of the Darke County Court of Common Pleas, which found that CTI had fraudulently transferred a 63-acre farm to TLH with the intent to avoid a debt owed to the estate of Gerald Stephens. William and Laura Ross are the owners of CTI and TLH. The history of the case is complicated. In 1996, Stephens retired from his employment at Valor Enterprises, Inc. ("Valor"). Pursuant to his pension plan, he was entitled to receive a retirement benefit from Valor of $10,000 per year for ten years. Stephens v. Valor Ent., Inc.
(2001), 141 Ohio App.3d 615, 752 N.E.2d 358 ("Stephens I"). Valor had secured these retirement payments by purchasing a whole life insurance policy on Stephens' life. Id. However, Valor subsequently stopped paying the premiums on the policy and borrowed against its cash value without Stephens' knowledge. Valor stopped making payments to Stephens approximately two years after his retirement.
 {¶ 2} In 1999, Stephens filed a complaint against Valor in the Miami County Court of Common Pleas for the payment of his retirement benefits. Valor had been owned by the Cota family. However, National City Bank ("National City") had acquired Valor's assets through foreclosure. As part of the foreclosure proceedings, National City had obtained a certificate of judgment encumbering a farm owned by the Cotas in Darke County. National City later sold Valor's assets, including its legal rights in the assets of the Cota family, to CTI. Huntington Bank ("Huntington") financed this purchase. As a result of these developments, Stephens pursued his claim against CTI.
 {¶ 3} The Rosses owned several companies, including CTI, TLH, and Fairport Yachts. In February 2000, CTI settled its claims against the Cota family. Pursuant to the parties' agreement, the Cota family deeded the 63-acre farm to TLH in exchange for $20,000 and a release of the judgment liens. The $20,000 that was given to the Cotas was drawn on the account of Fairport Yachts. The agreement between CTI and TLH was that TLH would pay $20,000 (to the Cotas) and issue a promissory note to CTI in the amount of $165,000. In October 2001, CTI's assets were seized by Huntington Bank and it effectively went out of business.
 {¶ 4} Stephens' claim against Valor and CTI went to trial in November 2001. Valor and CTI did not defend against Stephens' claim, and the Miami County court entered a judgment against them in the amount of $80,480.45. Stephens filed a complaint in Darke County for execution and foreclosure against the farm based on the Miami County certificates of judgment. Stephens asserted that the transfer of the farm directly from the Cota family to TLH in settlement of CTI's claim was for the purpose of avoiding payment of Stephens' claim. This case went to trial in February 2004. The trial court concluded that "the assignment of the judgment lien from CTI to TLH Properties was a fraudulent transfer due to the intent of CTI Audio, Inc. to defraud the claims of Gerald Stephens" in violation of R.C. 1336.04(A)(1). As such, the trial court voided the assignment and entered judgment in favor of Stephens against CTI.
 {¶ 5} CTI, TLH, and the Rosses appeal from the trial court's judgment, raising six assignments of error.
a. "Plaintiff failed to demonstrate the first element of a fraudulent transfer: that plaintiff had a claim against the transferor, CTI, and absent such claim, plaintiff cannot prevail on its allegation that CTI avoided plaintiff's claim by virtue of the assignment of the cota claim."
 {¶ 6} CTI claims that it should have been allowed to challenge the Miami County judgment in the Darke County action because it "did not appear or contest the allegations at the final hearing" in the Miami County case. TLH also points out that it was not a party to the Miami County case. Following a hearing, the Miami County court determined that Valor owed Stephens $80,480.45 in retirement benefits and that CTI was a successor in interest to Valor. The trial court in this case concluded that CTI was barred from challenging the validity of the Miami County judgment on res judicata grounds.
 {¶ 7} In Grava v. Parkman Twp. (1995), 73 Ohio St.3d 379,382, 1995-Ohio-331, 653 N.E.2d 226, the supreme court held that "a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." Thus, the supreme court has stated that "an existing final judgment or decree between the parties to litigation is conclusive as to all claims which were or mighthave been litigated in the first lawsuit." (Emphasis sic.) Id., quoting Rogers v. Whitehall (1986), 25 Ohio St.3d 67, 69,494 N.E.2d 1387. A person or entity, although not technically a party to a prior judgment, may nevertheless be connected with it by his interest in the result of that litigation or by his active participation in the prior proceeding so as to be bound by the judgment. Allstate Ins. Co. v. Merrick (June 23, 1993), Montgomery App. No. 13812, citing Whitehead v. General Tel. Co.of Ohio (1969), 20 Ohio St.2d 108, 112, 254 N.E.2d 10. In ascertaining whether a party has been connected with litigation, a court must look behind the nominal parties to the substance of the cause to determine the real parties in interest. Id., citingGoodson v. McDonough Power Equip., Inc. (1983),2 Ohio St.3d 193, 200, 443 N.E.2d 978.
 {¶ 8} Although they emphasize that they were not present at the final hearing in the Miami County case, the Rosses and CTI did participate in that case. We do not have the full record, but our opinion in Stephens I, 141 Ohio App.3d at 620, indicates that CTI had filed an answer and a motion to dismiss in the Miami County case. At the trial in Darke County, William Ross ("Ross") testified that he had not believed that Stephens had had a meritorious claim against CTI in the prior action: "I felt that it was a claim against Valor and there was no basis for claims against CTI so I didn't consider it to be a creditor claim." The trial court reasonably interpreted this testimony to mean that Ross had made a conscious choice not to continue to defend against Stephens' claim. Ross acted at his own peril when he decided, in the midst of the litigation, that the claim against CTI was without merit and that he need not defend against it.
 {¶ 9} Based on the doctrine of res judicata, the trial court concluded that the Miami County judgment was valid. In light of Ross' testimony and the participation of common parties in the Miami County and Darke County litigations, the trial court properly concluded that CTI was barred from challenging the validity of the Miami County judgment. CTI had had the opportunity to challenge Stephens' claim and had apparently made a calculated decision not to do so. Because CTI's claim that there was no basis for a judgment in Stephens' favor might have been litigated in the first lawsuit, it is precisely the type of claim that is barred by Grava. Moreover, because of the common ownership of CTI and TLH, we do not find that the fact that TLH was not a party to the Miami County case entitles the Rosses or TLH to challenge the issues determined therein.
 {¶ 10} CTI compares this case to Merrick, supra, in which an insurance company successfully challenged the res judicata effect of a determination that its insured had acted negligently rather than intentionally in sexually molesting a child. This finding had been made at a hearing during litigation between the insured and the family of the alleged victim. No evidence had been presented; rather, the alleged victim's attorney read a stipulation into the record that some of the insured's conduct had been negligent, some had been reckless, and some had been intentional. We concluded that the characterization of the insured's conduct as negligent had not been "actually litigated" where no evidence had been taken and that the insured had not vigorously represented the insurance company's interest, as the insured's interests were in conflict with those of the insurance company.
 {¶ 11} Merrick is clearly distinguishable from the case herein, where the parties have not even argued that CTI, TLH, and their owners, the Rosses, had divergent interests. Moreover, the issue of Stephens' entitlement to retirement benefits has actually been litigated, and CTI had an incentive to litigate the issue in dispute, although Ross apparently did not recognize it at the time. The fact that CTI chose not to participate in the proceedings does not alter the fact that the trial court heard evidence upon which it based its conclusion. Thus, the rationale in Merrick does not apply in this case.
 {¶ 12} The first assignment of error is overruled.
 {¶ 13} "CTI's assignment of the cota claim to tlh is not a fraudulent transfer under the statute since the `cota claim' does not qualify as an `asset' as required to support a fraudulent transfer action."
 {¶ 14} CTI's purchase of Valor's assets from National City was financed by Huntington, and CTI and Huntington thereby entered into a "Credit Facility and Security Agreement, Accounts Receivable, Inventory, and Equipment." This agreement was offered into evidence in the trial court, but the schedules and exhibits referenced in the agreement were not.
 {¶ 15} CTI claims that the Cota farm was not an asset as defined under the Ohio Uniform Fraudulent Transfer Act, R.C. Chapter 1336, because the farm was encumbered by CTI's financing agreement with Huntington. It contends that Huntington "undeniably" had a security interest in the Cota claim, which included the farm. On the other hand, Stephens contends that the claim against the Cota farm did not fall within the definition of "collateral" set forth in Huntington's agreement with CTI. In the alternative, Stephens asserts that, if Huntington did have a security interest in the Cota claim, there is no evidence that it released that interest when the farm was transferred to TLH. Thus, TLH would have taken the farm subject to that interest. The financing arrangement, however, does not suggest that TLH took the farm subject to a security interest. Stephens contends that it is more logical to conclude that Huntington was unaware of CTI's claim against the farm.
 {¶ 16} It is difficult to determine whether Huntington Bank had a security interest in the farm. The definition of collateral in the security agreement does not specifically mention real estate or certificates of judgment, nor is the farm itself mentioned in the security agreement. The definition of collateral does include "accounts receivable," "investment property," and "general intangibles," which could arguably encompass the property or the certificate of judgment, but CTI does not advance any of these arguments specifically, and we are reluctant to do so. It is clear that neither CTI nor Huntington had an actual mortgage on the Cota farm. We need not resolve this issue, however. We will assume, for the sake of argument, that Huntington had a security interest in the farm.
 {¶ 17} CTI claims that its actions cannot come within the Ohio Uniform Fraudulent Transfer Act because the Act addresses transfers of an asset or an interest in an asset, and the Cota farm is not an "asset" pursuant to the Act. CTI relies on R.C.1336.01(B)(1), which defines an asset as property of a debtor, but excludes from that definition "[p]roperty to the extent it is encumbered by a valid lien." A lien, as defined by the Act, includes a security interest created by agreement. R.C.1336.01(H). Based on these definitions, CTI contends that the farm was not an asset as defined by the Act. We disagree with this interpretation. The Act defines an asset to exclude propertyto the extent that it is encumbered by a valid lien, R.C.1336.01(B)(1); it does not necessarily exclude the encumbered property in its entirety. Thus, the farm is excluded from the definition of an asset only to the extent that it is encumbered by Huntington's security interest.
 {¶ 18} No evidence was presented about the extent to which the farm was encumbered. CTI points only to the trial court's statement in its judgment that "it appears that the assets of CTI were encumbered by its financing agreement with Huntington National Bank." However, this is not evidence, and the trial court's statement was taken out of context. The entire statement with respect the encumbrance of assets was:
 {¶ 19} "[I]t appears that the assets of CTI were encumbered by its financing agreement with Huntington National Bank. A possible exception was the 63 acre tract which apparently was not subject to mortgage. Since other assets of CTI were encumbered, the assignment of this real estate to TLH Properties removed this asset from any creditor attachment."
 {¶ 20} It is disingenuous for CTI to cite this portion of the trial court's judgment as "evidence" that the farm was encumbered. In fact, as Stephens points out, there is no evidence in this record that Huntington knew of the existence of CTI's certificate of judgment against the Cotas. Huntington does not seem to have had any involvement or to have given consent to the transfer of the farm from CTI to TLH. Accordingly, in the absence of evidence that the farm was fully encumbered, we reject CTI's argument that it was not an asset as defined in R.C.1336.01(B)(1).
 {¶ 21} The second assignment of error is overruled.
 {¶ 22} We will address the third, fourth, and fifth assignments of error together.
 {¶ 23} IV. "Having failed to prove ten of eleven `badges of fraud', plaintiff failed to prove `actual intent' to defraud."
 {¶ 24} "Since tlh paid $185,000 for the cota claim and the claim was worth no more than $185,000, the transfer is supported by adequate consideration and is not fraudulent."
 {¶ 25} CTI claims that Stephens failed to prove fraud by clear and convincing evidence. Of the eleven "badges of fraud" set forth in R.C. 1336.04(B), CTI claims that only one was even arguably established: that the assignment was an attempt to remove an asset from creditor attachment. It claims that six badges clearly were not established, and that the trial court misconstrued the four other badges on which it relied.
 {¶ 26} The statutory factors to be considered, among others, in determining whether a fraudulent transfer has occurred are:
 {¶ 27} "(1) Whether the transfer or obligation was to an insider;
 {¶ 28} "(2) Whether the debtor retained possession or control of the property transferred after the transfer;
 {¶ 29} "(3) Whether the transfer or obligation was disclosed or concealed;
 {¶ 30} "(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
 {¶ 31} "(5) Whether the transfer was of substantially all of the assets of the debtor;
 {¶ 32} "(6) Whether the debtor absconded;
 {¶ 33} "(7) Whether the debtor removed or concealed assets;
 {¶ 34} "(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
 {¶ 35} "(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
 {¶ 36} "(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;
 {¶ 37} "(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor." R.C. 1336.04(B).
 {¶ 38} The trial court found that the transfer from CTI to TLH involved insiders, as both entities were owned and managed by the Rosses. Because of these overlapping ownership interests, the trial court also found that the farm "effectively remained in the hands of the same persons both before and after the purported assignment of real estate." Although no judgment had been entered at the time of the transfer from CTI to TLH, the trial court noted that the parties had been aware of the claim at that point. The trial court further found that the assignment agreement between CTI and TLH was not signed by the parties and therefore was not binding, and that equivalent value was not given. Finally, the trial court relied on the facts that the transfer of the asset occurred shortly before CTI became insolvent and that the transfer removed the asset from any creditor attachment. Based on these factors, the trial court concluded that the transfer had been fraudulent. It also expressly stated that it had found the credibility of CTI's witnesses and documents to be "lacking at times."
 {¶ 39} While proof of one or more of the badges of fraud tends to show the existence of actual intent to defraud, it does not constitute proof of fraud per se. Gevedon v. Ivey,
Montomgery App. No. 19893, 2003-Ohio-6521, citing AtlanticVeneer Corp. v. Robbins, Pike App. No. 01CA678, 2002-Ohio-5363 and Ford v. Star Bank N.A. (Aug. 27, 1998), Lawrence App. No. 97CA39. Once a creditor demonstrates a sufficient number of these badges of fraud with regard to a transfer, the burden of proof shifts to the debtor to prove that the transfer was not fraudulent. Id. To rebut this presumption of fraud, the debtor can demonstrate that he or she made the transfer in good faith for a reasonably equivalent value. R.C. 1336.08(A); id.
CTI claims that the trial court should not have equated the insider and the control elements of R.C. 1336.04(B)(1) and (2), using the same facts to find two badges of fraud, because the legislature must be presumed to have intended for these factors to have distinct meanings. Although we agree with CTI that these factors are distinct, this fact does not preclude the court from relying on the same evidence to find both factors. Because the Rosses owned both CTI and TLH, the trial court could have reasonably concluded that the transfer was between insiders and
that the Rosses controlled the property both before and after the transfer.
 {¶ 40} CTI also claims that it was not on notice of the claim against it when it transfered the farm to TLH because "a meritless suit does not put the transferor on notice of a potential claim" and "[t]he view that the Valor suit was meritless in February 2000 was well-founded." The trial court concluded that CTI had been aware of Stephens' claim when it transferred its interest in the farm to TLH, although the claim had not yet been reduced to a judgment.
 {¶ 41} We reject CTI's argument that a "meritless suit" does not give notice of a "potential claim." Almost any suit evinces a "potential claim" and, as discussed supra, a defendant concludes that a pending claim is meritless at his own risk. CTI took such a risk in the Miami County case by deciding not to litigate the issues therein. Its argument that the "meritless" nature of this claim failed to put it on notice of potential liability is a backdoor attempt to get us to revisit the issues that were determined with finality in the Miami County proceedings. As we discussed under the first assignment of error, res judicata bars further litigation of the issues that CTI could have contested in the Miami County action. At this point, the merit of the underlying suit has been established. Stephens had no duty to present evidence that "CTI [had] viewed the suit as having merit," as CTI suggests. Thus, the trial court properly concluded that CTI had been on notice of this claim when the asset was transferred.
 {¶ 42} Next, CTI challenges that trial court's conclusion that TLH did not give sufficient, valid consideration for the assignment of the farm. CTI claims that, in exchange for the farm, TLH paid $20,000 to the Cota family and issued a promissory note to CTI for $165,000, and that $185,000 represented fair consideration. The trial court concluded that the promissory note was unenforceable because it was unsigned and that the dates of wire transfers did not comport with the dates of the alleged assignment. The trial court reasonably concluded that an unsigned note did not evince true indebtedness and thus did not represent fair consideration. This is especially true where the trial court has expressed skepticism about the credibility of the defense witnesses and its documents. Similarly, the trial court was not required to credit CTI's evidence that wire transfers between CTI and TLH months after the assignment were related to that assignment.
 {¶ 43} Finally, CTI challenges the court's conclusion that the assignment occurred shortly before CTI became insolvent. This conclusion was based largely on the trial court's distrust of financial records provided by CTI and its belief that equity attributable to indebtedness owned by subsidiary and related companies "apparently was not collectable or of any real value." The trial court noted that CTI should have remained viable based on the financial information it presented, and that a satisfactory explanation had not been provided for why it did not remain viable. Moreover, we note that under such a financial arrangement, the timing of the company's insolvency was largely within the control of its owners. The record was replete with evidence that the Rosses owned multiple companies, that money was routinely transferred among these companies, and that more than one of these companies had been involved in a foreclosure and assets-only sale that left creditors unprotected. "[I]n view of the transactional practices and relationship between parties, and in view of the practice of transferring assets only and closing the business without protection of creditors," the trial court reasonably found that CTI was insolvent at the time of the assignment in question.
 {¶ 44} Having found evidence of several badges of fraud, and having found the rebuttal evidence provided by CTI and the Rosses to be lacking in credibility, the trial court reasonably concluded that CTI had had actual intent to defraud Stephens.
 {¶ 45} The third, fourth, and fifth assignments of error are overruled.
 {¶ 46} "In reaching its decision, the trial court relied upon a document never offered nor admitted into evidence."
 {¶ 47} CTI claims that the trial court erred by considering Plaintiff's Exhibit 31, which was never admitted into evidence.
 {¶ 48} Plaintiff's Exhibit 31 purported to be a limited liability agreement for the formation of a company called Omnitronics. Under the agreement, TLH would have owned eighty percent of Omnitronics. The document was introduced during Ross' testimony, after he had denied that TLH had ever had an ownership interest in Omnitronics. The document appeared to have been executed, as it was signed by Ross. He asserted, however, that such an arrangement had been contemplated but had not come to fruition. The trial court cited this document in commenting on the credibility of the witnesses, as an example of "witnesses contradict[ing] the documents, for the apparent purpose of prevailing at trial."
 {¶ 49} CTI correctly points out that the document was not admitted into evidence. CTI did not object to this line of questioning, however, except for a general, continuing objection to questions about "non-parties," which was overruled. Because this was not the only document or testimony on which the trial court based its conclusion that the defense's case lacked credibility, we conclude that the trial court's reference to this unadmitted exhibit was harmless error.
 {¶ 50} The sixth assignment of error is overruled.
 {¶ 51} The judgment of the trial court will be affirmed.
Grady, J. and Young, J., concur.